# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| RONALD SIMMS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 6:15-cv-03110-NKL |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

Plaintiff Ronald Simms appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. The decision is affirmed.

**I. Background**

Simms was born in 1967. He alleges disability beginning May 1, 2012.

    **A.    Medical and other history**

On May 28, 2011, Simms saw his chiropractor with complaints of lower back, neck, and hip pain.

At a September 2011 visit with a primary care provider, Tamra Ward, APN, Simms received an injection in his right shoulder for pain. He continued to complain of shoulder pain, as well as back and neck pain, and in January 2012 he was diagnosed with muscle spasms.

An MRI was performed on February 20, 2012, which showed problems in Simms' right shoulder, so he had surgery on March 29, 2012 by Gregory Hubbard, M.D. Simms' post-operative diagnosis was impingement syndrome with full-thickness rotator cuff tear and loose anterior labral tear of the right shoulder. Simms had physical therapy after the surgery and saw

his surgeon monthly for a period of time. At a July 2011 visit, Dr. Hubbard noted Simms had had no post-operative complications. Simms was experiencing some mild pain, but taking no pain medication. The surgeon noted Simms could resume activities as tolerated; could be returned to full work duty; and to follow up as needed. The surgeon also noted Simms had been "fired from power line job, looking into new career." [Tr. 354.]

Simms applied for vocational rehabilitation services through the State of Missouri in August 2012. Where asked on the form what his disability is, Simms answered, "shoulder." [Tr. 325.] He explained that he could not lift heavy things, or lift overhead. At a September 2012 visit with the VR counselor, Simms said the railroad was a big business in the town where he lived. The counselor noted Simms wanted "to look more in the areas of the railroad, possible truck driving at this point." [Tr. 318.] In October 2012, Simms was "a little despondent as he has not found a job yet and his efforts to find out about getting on with the railroad have not panned out yet." [Tr. 317.] He also reported that he was having problems with his shoulder, back, and neck, and was going to see his doctor. Later than month, he asked that his case be put on hold while he was undergoing medical testing. In February 2013, Simms asked that his case be closed, because he was actively pursuing disability benefits, was in too much pain, and was concerned that work could worsen his condition.

At a visit with APN Ward on September 28, 2012, Simms complained of right shoulder pain, and pain in the upper back and neck. A physical exam showed a tender back on the right side. The diagnosis was back and neck pain, and muscle spasms. Simms was prescribed a muscle relaxer and pain medication. At a follow up visit in October, Simms reported he had "been doing good." [Tr. 407.] His medications were continued.

A CT scan performed on October 26, 2012, showed mild multilevel degenerative disc changes at T6-7 through T11-12; additional mild multilevel facet joint osteoarthritic changes

without central canal or neural foraminal encroachments; posterior disc protrusions at T7-8, T8-9, and T9-10; remote granulomatous disease with densely calcified granuloma left lower lobe; and right upper lobe subpleural nodule. The cervical spine showed mild spondylosis at C5-6 and C6-7, and mild C7-T1 facet joint osteoarthritic changes. The lumbar spine showed degenerative disc bulging and spondylosis at L1-2; mild spondylosis without significant disc bulging at L2-5; mild right paracentral disc bulging at L5-S1; mild L4-5 and L5-S1 facet joint hypertrophy without encroachment; and atherosclerotic peripheral vascular changes with two point eight centimeter aneurysmal dilatation of the infrarenal abdominal.

Simms saw Ricardo Kennedy, M.D. on November 27, 2012 for neck pain. On exam, Dr. Kennedy found low cervical spinal tenderness, paraspinous tenderness, bilateral cervical and upper thoracic paraspinous tenderness, and pain with cervical spine range of motion. At a follow-up visit on January 21, 2013, Dr. Kennedy diagnosed Simms with cervical intervertebral disc disorder, cervical spondylosis without myelopathy, neck pain, and muscle spasms. Simms was instructed to return as needed.

Simms saw Leslie Batterton, APN, in January 2013, with complaints of hip pain. He was prescribed pain medication.

In March 2013, Dr. Thompson gave Simms a cervical epidural steroid injection. Simms saw APN Ward in April 2013 and May 2013, with complaints of back pain. At both visits he was given intramuscular injections of pain medication.

Diagnostic imaging taken on June 20, 2013, showed mild disc space narrowing and spondylosis at L1-2; additional mild spondylosis at L2-; L5-S1 right paracentral disc bulging without epidural adipose tissue effacement or thecal sac impingement; slight hypertrophy of the right L4-5 and right L5-S1 facet joints without encroachment; and a 2.9 diameter abdominal aortic aneurysmal dilation. The cervical spine showed central to left paracentral disc protrusion

3

at C5-6 with mild anterior surface cord impingement; additional mild posterior disc bulging at C6-7; mild spondylosis at C4-7; mild facet joint hypertrophy without encroachment at C7-T1; and straightening of normal lordosis, which was possibly secondary to spasm, positioning, or posture. On June 25, 2013, Simms followed up with Dr. Thompson for low back pain and to discuss the imaging results. Dr. Thompson's treatment notes indicate Simms had chronic axial pain with a history of failed conservative treatment. Simms was given right L3-4 medial branch and right L5 dorsal diagnostic blocks on July 5, 2013. The next day, he reported a 70 to 80% decrease in pain, and great improvement in his activities of daily living.

On August 6, 2013, Simms saw APN Batterton with complaints of back pain. He was given intramuscular injections of steroid and pain medication, and his hydrocodone prescription was renewed. Simms saw Dr. Thompson on August 20, 2013 for low back and neck pain, and doctor noted continued chronic axial pain. Simms received a right L3-4 medial branch block and right L5 dorsal diagnostic block, and had 80% pain reduction.

Simms saw APN Batterton once a month from November 2013 through February 2014, with complaints of back, neck, and shoulder pain, and was given intramuscular injections for pain and inflammation. He reported in January 2014 that one of his pain medications, gabapentin, made him feel drunk; the dosage was decreased.

Dr. Thompson referred Simms to Dr. Brenton Coyer, Mercy Spine Center. Dr. Coyer saw Simms on February 7, 2014. Simms reported longstanding neck and back pain, and that his back pain had lasted for "greater than 10 years." [Tr. 499.] Simms reported that his neck pain radiated down the left arm, with numbness in the fingers. He also reported that his low back pain radiated to the medial aspect of his thighs, down to knee level, but denied numbness in the toes. Dr. Coger reviewed Simms' June 2013 CT scans. On exam, Dr. Coger noted no musculoskeletal or neurologic abnormalities. The assessment was neck and low back pain. Dr. Coger

4

recommended an MRI of the cervical and lumbar spine, and prescribed a course of physical therapy. The doctor also gave Simms an instruction book with back and neck exercises.

On February 19, 2014, an MRI showed Simms had mild chronic degenerative spondylosis of the cervical spine, most significant at the C5-6 level. A February 20, 2014, MRI showed mild chronic degenerative spondylosis of the lumbar spine without central thecal sac stenosis, anatomic alignment preserved, but a mild chronic L1 compression deformity was also seen. A February 26, 2014 MRI showed mild chronic spondylosis, most severe at T8-9 with mild central stenosis.

Simms returned to see Dr. Coger on March 24, 2014 for additional evaluation. Simms reported "pain in touching multiple areas of his body." [Tr. 494.] Dr. Coger noted no musculoskeletal or neurologic abnormalities on physical exam. The doctor reviewed Simms' MRI results. Under "Plan," Dr. Coger wrote:

> I recommend that he be re-evaluated by his primary care physician in order to rule out the presence of fibromyalgia as some of his symptoms are quite suspicious for this entity. I see no indication for operative intervention in this individual. I would also like to refer him to a rheumatologist for additional evaluation, as they may want to perform an EMG of the bilateral upper extremities and bilateral lower extremities. I believe all of his symptoms may be muscular in relation and facet related. The patient reports that he did undergo steroid injections by a pain doctor…without relief of his symptoms.

[Tr. 495.]

Simms saw APN Ward three times in March 2014, and received two rounds of injections in his back. He was prescribed a new medication, Lyrica, at one visit, but at a follow up visit admitted he had not filled the prescription yet. He saw APN Ward in April 2014 to discuss some lab results. He reported that the injections had worked for a few days.

Dr. Coger referred Simms to a neurologist, Jennifer Zhai, M.D., in April 2014 concerning arm pain. But Simms complained to Dr. Zhai of having had chronic pain in his neck, and middle

5

and lower back for several years. He said the pain in his arms and legs felt like joint or bone pain. He reported that changes in weather, and increased physical activities, make the pain worse. He told the doctor that he had had injections in his spine and chiropractic treatment, but they did not help. He also said he had been seen by a neurosurgeon and was told he would not have surgery. Dr. Zhai's exam findings were largely unremarkable. Simms had normal gait, normal muscle tone and strength in all extremities. He did not report severe limitations in his activities of daily living. Dr. Zhai's diagnosis was neck and back pain by clinical history, and possible carpal tunnel syndrome, though she noted CTS would not explain his complaints of all-over pain. Dr. Zhai stated Simms would be referred to a rheumatologist to check for rheumatologic disease.

On July 10, 2014, Simms saw APN Ward with complaints of pain in his spine. He stated that a new prescription, Lyrica, was "not working real good," and the dosage was increased. [Tr. 539.] On August 29, 2014, he returned with complaint of back pain, and was given intramuscular injections of a steroid and pain medication. On September 4, 2014, Simms reported that the Lyrica helps, but complained of pain in his back. He was given an intramuscular injection of pain medication, and was reminded to keep his appointment with the pain clinic.

Simms saw Jo Ellen Fuegate, M.D., at the pain clinic in September 2014 about his back pain. The doctor's findings on physical exam included: "neck: normal range of motion; musculoskeletal: normal range of motion, no edema, no tenderness; neurological: normal muscle tone." [Tr. 541.] Dr. Zhai's impression was chronic back pain with fairly normal MRIs. She opined that a rheumatologic cause for the back pain was unlikely but that a blood test would be done. She ordered a trial of naproxen and Cymbalta for pain instead of Mobic, and physical therapy. She instructed Simms to follow up with his primary care physician.

B. Opinion evidence

APN Ward prepared a medical source statement on January 25, 2013. [Tr. 433-34.] She opined that Simms could lift ten pounds frequently and twenty-five pounds occasionally; could stand and walk continuously for thirty minutes and for one hour total; could sit continuously for fifteen minutes and for less than one hour total; was limited in his ability to push or pull; should avoid exposure to environmental conditions; would need to lie down to relieve pain every forty-five minutes for two hours at a time; and had diminished ability to concentrate due to pain. APN Ward prepared another medical source statement on March 13, 2014. [Tr. 471-472.] She opined that Simms would miss two days of work per month; be off-task 25% of the time; had marked limitations in understanding and memory; and had marked or extreme limitations in sustained concentration and persistence, social interactions, and adaptation. The ALJ gave APN Ward's opinions very little weight.

On October 18, 2013, Simms had a psychological evaluation by psychologist Steven Adams, Ph.D. [Tr. 452-55.] Dr. Adams' primary diagnosis of Simms was major depressive disorder, single episode, moderate. The doctor assigned a GAF score of 40. He recommended individual psychotherapy so that Simms could learn coping skills for changing life circumstances and chronic pain. The doctor opined that Simms did not seem able to understand or remember simple instructions, nor sustain concentration and persistence on simple tasks, but that Simms could interact in moderately demanding social situations and adapt to typical work environments. Dr. Adams also prepared a medical source statement, dated April 14, 2014. [Tr. 485-486.] He opined that Simms had moderate to marked limitations in understanding and memory, and sustained concentration and persistence; and mild to moderate limitations in social interactions and adaptation. The ALJ gave Dr. Adams' opinions very little weight.

Dr. Coger prepared a medical source statement dated March 27, 2014. [Tr. 488-490.]

Where asked on the form to identify "clinical findings & objective signs," Dr. Coger noted only, "normal neurologic exam." [Tr. 488.] Dr. Coger opined that Simms could lift ten pounds frequently; sit for two hours at a time and six hours total in a workday; could stand for two hours at a time and two hours total in a workday; would require three to four breaks per day each lasting ten to fifteen minutes; and would miss three days of work per month due to his medical symptoms. The ALJ gave Dr. Coger's opinion "less weight." [Tr. 27.]

Stephen Williamson, M.D., a specialist in occupational medicine, examined Simms and prepared a medical source statement dated May 17, 2014. [Tr. 506-516.] Dr. Williamson opined Simms' alleged hearing loss was not supported because he had the ability to sense normal conversational tones, and noted Simms did not claim any mental impairments during the exam. The doctor opined that Simms could occasionally lift ten pounds; sit for two hours at one time and six hours total; walk for ten minutes at a time; walk and stand one hour total; occasionally handle, finger, feel, and reach bilaterally with upper extremities; and never balance, stoop, kneel, crouch, or crawl, or climb ladders, ramps, scaffolds, or stairs. Dr. Williamson also prepared an accompanying medical report, stating Simms had bone spurs in his back and neck, as supported by spondylosis identified on CT examinations; bulging disc, as supported by decreased range of motion in the back and back weakness; and a right shoulder injury, as supported by lateralizing decreased range of motion and weakness. Dr. Williamson diagnosed decreased vibratory sensation throughout the body; hypertension; back weakness and decreased range of motion of the shoulders bilaterally. [Tr. 517-522.]

On May 31, 2014, Dr. Frederick, a psychologist, issued a medical source statement in which he opined that Simms' ability to understand, carry out, and remember instructions was not affected by any mental health issues, nor was Simms' ability to interact with supervisors, coworkers and the public, or to respond to changes in the work setting. [Tr. 528-529.] In an

accompanying medical report, Dr. Frederick gave Simms a GAF score of 55; diagnosed major depressive disorder, moderate, but which would lift if Simms were no longer impoverished and in pain; and opined that Simms had no limitations beyond those imposed by his pain. [Tr. 530-534.] The ALJ gave Dr. Frederick's opinion great weight.

John Anigbogu, M.D., a specialist in physical rehabilitation medicine, testified at the September 2014 hearing. The doctor summarized the record showing that Simms underwent right shoulder surgery in 2012, with postoperative records showing improvement in his pain and range of motion of the right shoulder. Dr. Anigbogu stated that the record showed Simms had undergone an extensive work-up for his complaints, with MRI and CT scans showing degenerative disc disease of the spine, and specifically mild degenerative disc disease of the thoracic spine, degenerative disc disease without compromise of the cervical spine, and degenerative disc disease without compromise of the lumbar spine. Based on his review, Dr. Anigbogu opined that Simms could lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk for a total of about six hours in an eight-hour workday; had no limitations in sitting; could frequently climb ramps, stairs, ladders, and scaffolds; could frequently crouch and crawl and had no limitations in balancing, stooping, or kneeling. Dr. Anigbogu further opined that Simms could frequently push and pull with his arms; frequently reach overhead with his right arm with no limitation on the left arm and no limitation in reaching in all other directions bilaterally; had no limitations on pushing and pulling with his legs; had no limitations regarding exposure to extreme cold; and should be limited to only occasional vibration.

Dr. Anigbogu also testified that he had reviewed the opinions of Dr. Williamson and did not agree with the limitations Dr. Williamson suggested because they were not supported by the objective evidence. Dr. Anigbogu explained that he took subjective pain reports into

9

consideration in rendering his opinions, and compared such reports to "facts that would also back that up" in the medical evidence. [Tr. 52.] The ALJ gave Dr. Anigbogu's opinion substantial weight.

### C. Simms' adult function report and hearing testimony

In his Adult Function report prepared in September 2013, Simms stated that in a typical day, he will get up and drink coffee, take his medications, sit for about an hour, go outside and walk, come back inside and sit or take a nap, get up and take his medications, sit and watch television, go outside and sit on the back porch, come back inside and take medications, eat supper, go outside and sit until dark, and come back in and go to bed. About two or three nights a week, he wakes up due to pain, and has a hot shower and takes some medication. He has difficulty putting on shoes and socks, and washing his lower legs and feet. He cannot bend, get up and down, or walk for a long time for purposes of preparing meals or performing house or yard work. Simms drives and rides in a car. He goes to the grocery store by himself once or twice a month, spending an hour or hour and a half. Simms' ability to handle money has not changed since before onset of his alleged disability. Simms can no longer hunt or fish, and does not go to church or sporting events because he cannot sit that long.

Simms testified[1] that he has an eighth-grade education. He worked as an electrical lineman and electrical foreman lineman for 25 years, and worked briefly at a river resort, carrying canoes and transporting people. He stopped working in 2012. He never had a specific injury to his back. Simms said he can walk or stand about 15 minutes before needing to rest, and he can sit for about 15 minutes before needing to move. He can lift up to 20 or 30 pounds, but would be limited to lifting ten pounds throughout an eight-hour work day. At some point during the day, he has to lie down for an hour or two because of back pain. Simms described his back

---

[1] Simms testified at both the April and September 2014 hearings.

pain as "relentless, excruciating, something you can't never just get away from. It's always there." [Tr. 84.] He said he had had back pain at that level for two or two and a half years, and it has gotten progressively worse over time. The pain radiates into his neck and shoulders "twenty four/seven," and depending on how far he walks, it radiates into his legs. [Tr. 85.] He said he has bad days—when he mostly stays in bed—two or three days a week. Simms said he also experiences numbness in his hands, causing him to drop things, and that he has fallen six or eight times in the past year due to back pain. The pain also causes difficulty concentrating.

### D. The ALJ's decision

The ALJ found that during the relevant period, Simms had severe impairments of degenerative disc disease of the thoracic and cervical spine, residuals from right rotator cuff repair, and degenerative joint disease. Simms did not claim to meet any Listings, and the ALJ did not find that he met any.

The ALJ found Simms has the residual functional capacity to perform:

> [L]light work as defined in 20 CFR 416.967(b) and 416.967(b) except climb stairs and ramps occasionally but never climb ladders or scaffolds; stoop, kneel, crouch and crawl occasionally; push and pull with arms and legs and reach in all directions frequently; no lifting overhead; must avoid concentrated exposure to extreme cold and vibrations.

[Tr. 22.] The ALJ found Simms' statements concerning the intensity, persistence, and limiting effects of his alleged symptoms not entirely credible.

The ALJ concluded Simms could no longer perform his past relevant work as an electrical lineman, or electrical foreman lineman. However, based on vocational expert testimony, the ALJ found Simms could adjust to perform other work existing in significant numbers in the national economy, such as production worker, including electronics worker; and maid and housecleaner, including laundry worker. The ALJ further found that with an additional limitation of a sit-and-stand option with the ability to change position frequently, i.e., not more

11

often than every hour, Simms could still perform the job of production worker, including hand packager.

The ALJ concluded Simms is not disabled.

## II. Discussion

Simms argues that the ALJ's credibility finding is unsupported by substantial evidence; the ALJ failed to properly weigh the opinion evidence; and the RFC is not supported by substantial evidence.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. The credibility finding

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). The ALJ must consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa v. Sullivan*, 922 F.2d 480, 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). An ALJ may discount a claimant's complaints if they are inconsistent with the record as a whole. *Wildman v. Astrue,* 596 F.3d 959, 968 (8th Cir. 2010). The primary question is not whether a claimant actually experiences the subjective complaints alleged, but

12

whether those symptoms are credible to the extent they prevent the claimant from actually performing substantial gainful activity. *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir. 2001).

A reviewing court normally defers to an ALJ's credibility finding if the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (citation omitted), and when substantial evidence on the record as a whole supports the credibility finding, *Peña v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996).

The ALJ concluded Simms' description of the severity of his pain and other symptoms was exaggerated and inconsistent with the medical records, and so extreme as to appear implausible. [Tr. 23.] Simms testified that he had "relentless, excruciating" pain that he could never get away from, and that he had experienced it for two or two and a half years. He said pain radiated into his shoulders and neck "twenty four/seven" and that he had bad days two or three times a week that would require him to spend most of the day in bed. He also said he dropped things all the time due to numbness and had fallen six to eight times in the last year.

Nowhere do Simms' medical providers record complaints of such extreme and persistent pain, nor numbness causing Simms to drop things all the time and to have fallen six to eight times in the last year, nor findings on physical exam to support such complaints. To the contrary, for example, Simms had shoulder surgery in March 2012 and five weeks later, was taking no pain medication. By July 2012—after Simms' alleged May 2, 2012 onset date— Dr. Hubbard indicated Simms could resume activities as tolerated, could return to work full duty, and to follow up as needed. Simms never returned to Dr. Hubbard. In a medical source statement dated March 27, 2014, Dr. Coger noted "normal neurologic exam." [Tr. 488.] In September 2014, Dr. Fuegate's findings on physical exam were normal: "neck: normal range of motion; musculoskeletal: normal range of motion, no edema, no tenderness; neurological: normal muscle tone." [Tr. 541.] The lack of objective medical evidence is a factor an ALJ may

consider in assessing credibility. *Forte v. Barnhart,* 377 F.3d 892, 895 (8th Cir. 2004); 42 U.S.C. § 423(d)(5)(A) (a claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability… There must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques.").

Simms was also looking for work after the alleged onset date. He told Dr. Hubbard in July 2012 that he had been fired from his power line job and was looking for a new career. In August 2012, Simms sought vocational rehabilitation services, describing his only disability as "shoulder," which prevented him from lifting heavy things or lifting overhead, and began exploring working for a railroad or as a truck driver. [Tr. 325.] Seeking employment is generally inconsistent with a claim of disability. *Toland v. Colvin,* 761 F.3d 931, 936 (8th Cir. 2014).

The ALJ additionally noted that although Simms claimed he could sit no longer than 15 minute at a time, Simms sat for 52 minutes at the first hearing, and 43 minutes at the second without apparent difficulty. The ALJ could not reject Simms' claim solely on the basis of personal observations during the hearing, but could properly consider such observations as part of the overall credibility analysis. *See Johnson v. Apfel,* 240 F.3d 1145, 1147-48 (8th Cir. 2001). The ALJ also noted that in Simms' Adult Function Report, he admitted to sitting for an hour at a time, which was consistent with the ALJ's observations at the hearings.

Finally, the ALJ acknowledged Simms' reports that his daily activities were very limited. Simms did admit to being able to drive, shop alone for an hour or hour and half once or twice a month, walk outside, and perform self-care with some difficulty in putting on shoes and socks and washing his lower legs. Overall, the ALJ explained, Simms' reports of very limited daily activities were outweighed by other evidence in the record.

Substantial evidence on the whole record supports the ALJ's credibility determination

14

and it will not be disturbed.

## B. Weight given the opinion evidence

Simms argues that the ALJ did not properly weigh the opinions of Dr. Coger, who saw Simms twice; Dr. Anigbogu, who reviewed the medical records and testified at the second hearing; Dr. Williamson, a consulting examiner; and APN Ward, who saw Simms multiple times.

The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). The opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). But the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).

Dr. Coger saw Simms twice, and the ALJ gave "less weight" to the doctor's opinions. [Tr. 27.] The ALJ explained that Dr. Coger's exam records do not support the more restrictive areas Dr. Coger identified; the doctor did not have a treating or examining relationship with Simms; and the opinions were unsupported by clinical findings or objective signs. As Simms points out, Dr. Coger did have a treating or examining relationship with him. But the ALJ's deficiency in opinion writing does not prejudice Simms and does not require reversal. *Samons v.*

15

*Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (citations omitted) (reversal is necessary only if the failure prejudices the claimant); *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome). Dr. Coger reviewed the MRIs and did not consider Simms a candidate for back surgery. The doctor instead suspected Simms had fibromyalgia and that his symptoms were muscular and facet related. The doctor also recommended exercises. The doctor's opinions were conclusory, and unsupported by reference to clinical findings or objective signs, beyond a reference to "normal neurologic exam," which simply detracts from the restrictions identified. [Tr. 488.] Such opinions may appropriately be given less weight. *See Anderson v. Astrue,* 696 F.3d 790, 793 (8th Cir. 2012) (holding that the ALJ properly discounted a treating source opinion due to its conclusory nature, and because the assertions were not supported by and were inconsistent with the information contained in the doctor's treatment notes and other medical records).

    Simms argues that the ALJ improperly gave substantial weight to the opinion of Dr. Anigbogu, a non-examining consultant. Simms argues that the opinion was conclusory and lacked reference to support in the record, and that Dr. Anigbogu's specialty, pain and physical rehabilitation medicine, is not superior to Dr. Coger's. Simms argues that whether Dr. Anigbogu is familiar with the disability program and its requirements is not relevant to the question of Simms' functional limitations. Dr. Anigbogu's opinion was neither conclusory nor lacking in support. He testified that he had reviewed the medical records, and specifically mentioned the post-shoulder surgery records and the MRI and CT studies and results, an epidural steroid injection Simms had received, and the suggestion that Simms might have carpal tunnel syndrome. The doctor also mentioned that he wanted to know what medications Simms was taking, and Simms told him. [Tr. 46-47.] The doctor explicitly mentioned that he had

considered the opinion of Dr. Williamson, a consultative examiner, and that he took subjective complaints of pain into account when forming an opinion. Dr. Anigbogu opined that Simms could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for a total of six hours in an eight-hour work day; had no limitations on sitting; could frequently climb ramps, stairs, ladders and scaffolds; could frequently crouch and crawl; and had no limitations in balancing, stooping, or kneeling. The doctor also opined that Simms could frequently push and pull with his arms; frequently reach overhead with the right arm with no limitation on the left arm and no limitation in reaching all other direction bilaterally; had no limitation on pushing and pulling with his legs; had no limitation as to exposure to cold; and should be limited to only occasional vibration.

Furthermore, in weighing a medical source opinion, it is appropriate for an ALJ to consider factors including understanding of Social Security disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527, 416.927. Dr. Anigbogu had such familiarity, but the record does not indicate whether the providers to whom Simms points did.

Specialization is also appropriately considered. More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. *Id.* Simms argues that Dr. Anigbogu's specialty, pain and physical rehabilitation medicine is not superior to Dr. Coger's specialty. Dr. Coger works at a spine center, but Simms does not indicate what the specialty is. In any event, whether Dr. Coger has a specialty on par with Anigbogu's, it is the ALJ's duty to resolve conflicts among opinions. *Finch v. Astrue,* 547 F.3d 933, 936 (8th Cir. 2008).

Simms also argues that Dr. Williamson's consultative exam was overlooked. The ALJ heard Dr. Anigbogu's testimony in which he expressly mentioned Dr. Williamson's more extreme opinion and explained why he disagreed with it. [Tr. 50-51.] The ALJ also expressly

17

discussed Dr. Williamson's opinion in the decision. [Tr. 15, 18.] The opinion was not overlooked.

The ALJ's assessment of the weight to be given the opinion evidence is supported by substantial evidence.

### C. Formulation of the RFC

Finally, Simms argues that the RFC is not based on substantial evidence. Residual functional capacity is what a claimant can still do despite physical or mental limitations, and should take into account the effects of treatment a claimant receives, including frequency and disruption to routine. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). A claimant has the burden to prove his or her RFC at step four of the sequential evaluation. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Thus, an ALJ's failure to include certain limitations does not require reversal if there is no evidence that the "conditions impose any restrictions on [the claimant's] functional capabilities." *Owen v. Astrue,* 551 F.3d 792, 801 (8th Cir. 2008).

Here, the ALJ took into account Simms' physical and mental limitations, and his treatment, and the RFC is supported by substantial evidence on the whole record. As discussed above, the ALJ found Simms' alleged symptoms were not entirely credible, and were exaggerated and inconsistent. However, while the ALJ gave Dr. Anigbogu's opinion substantial weight, the ALJ included more limitations than Dr. Anigbogu identified, to give Simms "the utmost benefit of doubt." [Tr. 27.] Dr. Coger's opinion was given less weight, but certain aspects of the RFC are not wholly inconsistent with the limitations he identified. The ALJ similarly declined to impose limitations as extreme as those suggested by APN Ward, but certain aspects of the RFC are not wholly inconsistent with the limitations she identified. The RFC is also consistent with the records of Drs. Zhai and Fuegate, whose findings on physical exam were

essentially normal.

Accordingly, the RFC finding will not be disturbed.

## III.     Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:   October 29, 2015
Jefferson City, Missouri